FILED
04/06/2026
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2025

## STATE OF TENNESSEE v. MICHAEL WAYNE STROUTH

**Appeal from the Criminal Court for Sullivan County**
**No. S69472   William K. Rogers, Judge**

---

### No. E2024-01790-CCA-R3-CD

---

A Sullivan County jury convicted the Defendant, Michael Wayne Strouth, of first degree premeditated murder and conspiracy to commit first degree premeditated murder. The trial court imposed a life sentence for the first degree murder conviction and a consecutive twenty-five year sentence for the conspiracy conviction. On appeal, the Defendant asserts that: (1) the evidence is insufficient to sustain his convictions; (2) the trial court erred when it failed to give jury instructions on enhanced identification and general inferences; and (3) the trial court abused its discretion when it sentenced him. After review, we affirm the convictions and the Defendant's life sentence for first degree premeditated murder; however, we vacate the Defendant's sentence for conspiracy to commit first degree murder and the trial court's imposition of partial consecutive sentencing. We remand this case to the trial court for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Vacated in Part, and Remanded**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and MATTHEW J. WILSON, JJ., joined.

Larry R. Dillow, Kingsport, Tennessee, for the appellant, Michael Wayne Strouth.

Jonathan Skrmetti, Attorney General and Reporter; Ryan W. Davis, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Amber D. Massengill and Matthew W. Darby, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the shooting death of Michael Heatherly ("the victim"). The Defendant's wife, Ashley Strouth, and the victim shared a child, A.H.,[1] from a prior marriage. The victim and Mrs. Strouth had an ongoing custody dispute related to A.H. These custody issues troubled the Defendant. On September 1, 2017, the Defendant and Mrs. Strouth went to the victim's place of work (a Walmart) and waited for him outside. When the victim exited the building, the Defendant shot and killed him. A Sullivan County grand jury indicted the Defendant for first degree premeditated murder and conspiracy to commit first degree premeditated murder.

## A. Trial

At trial, the parties presented the following evidence: On the afternoon of September 1, 2017, Jeremy Poole, a Walmart employee, was in the parking lot gathering shopping carts when he heard a gunshot. He scanned the parking lot and observed a man, later identified as the victim, throw up his hands and then fall to the ground. Mr. Poole rushed over to the victim, who was face down, and saw "blood flowing up on his shirt, on his chest." The victim was unresponsive. Mr. Poole applied pressure to the wound and kept speaking to the victim in hopes of getting a response.

At around 3:00 p.m. on September 1, 2017, Bristol Police Department ("BPD") officer Matthew Cousins responded to a call about the shooting at Walmart. He arrived within minutes and found a large crowd gathered in the middle of the parking lot. As he approached the crowd, Officer Cousins saw the victim lying face down on the ground next to a Chevy Malibu. People present at the scene reported hearing a "large noise like a bang" and then finding the victim lying face down on the ground. He observed a large bullet hole above the driver's side window of the Chevy Malibu. Law enforcement later retrieved a .270 caliber bullet jacket fragment from this hole.

Officer Cousins then turned his attention to the victim, who had an apparent gunshot wound to the lower right back area, just below the shoulder blade. The victim was not speaking and appeared to be struggling to breathe. Officer Cousins retrieved a first aid bag from his vehicle to render aid to the victim and requested "rescue" on his police radio. Officer Cousins rolled the victim onto his back and observed that the victim's face was a "bluish gray color," indicating a lack of oxygen. The victim's eyes were fixed, and he was non-responsive. Officer Cousins located an exit wound at the center of the victim's chest. Officer Cousins confirmed that he wore a body camera during this incident. The State played the recording for the jury and introduced photographs of the victim's vehicle, a Chevy Malibu, a Lego set lying on the ground, a bag, and a Walmart receipt.

---

[1] This court refers to minors by their initials for purposes of privacy.

Dr. John Mark Woodard, the treating emergency room physician where the victim was transported, explained that the victim was deceased upon arrival, but CPR was in progress. According to Dr. Woodard, the victim's injury, a gunshot wound, was lethal. He described the entrance wound as a "large" wound to the right upper back. The bullet crossed the victim's mid-line and exited just left of the sternum on the victim's chest, also a "large" wound. After inspecting the wounds, Dr. Woodard concluded that the wound was "a large caliber high velocity wound," meaning it was not inflicted with a handgun but a gun that propelled larger bullets faster. Medical examiner, Dr. Andrea Orvik, reviewed[2] the victim's autopsy report and agreed with the findings of the report based upon her review of the entire file. Noting the bullet path through the victim's heart and right lung, Dr. Orvik testified that it would be unlikely that one would survive the injuries sustained. Dr. Orvik stated that the victim's cause of death was a gunshot to the chest.

Jess Lockhart, the Holston Valley Middle School principal at the time of these events, testified that school dismissed at 3:30 p.m., on September 1, 2017. Mr. Lockhart was in the office when the victim's son, A.H., asked to use the telephone to call the victim. A.H. explained to Mr. Lockhart that the victim was to pick him up from school and had not yet arrived. When A.H. could not reach his father, Mr. Lockhart assisted A.H. in calling Mrs. Strouth's place of work, which was also where the Defendant, A.H.'s stepfather was employed. Mr. Lockhart placed the call and asked to speak with Mrs. Strouth. He was briefly placed on hold and then told that Mrs. Strouth had not reported to work that day. Mr. Lockhart then asked to speak with the Defendant. After another brief hold, he was told the Defendant was not at work either.

Mr. Lockhart then looked for A.H.'s maternal grandmother's phone number. As he did so, he received a phone call from BPD detective Captain Danielle Eller.[3] Law enforcement had collected the victim's cell phone and noticed eight missed phone calls from the school. Mr. Lockhart explained that A.H. was trying to contact the victim because the victim had not picked him up from school. Captain Eller asked Mr. Lockhart to detain A.H. until she arrived. Captain Eller spoke with A.H. and learned that Mrs. Strouth drove a blue Hyundai Tucson ("blue Hyundai").

Mr. Lockhart confirmed that, based upon his interactions with the victim and Mrs. Strouth, he believed their relationship "wasn't great." He stated that he never observed outbursts or public arguments, but he felt tension or "friction" between the two.

---

[2] Dr. Sherman Hunt performed the victim's autopsy but died prior to trial.

[3] At the time of these events, Captain Eller was a Criminal Investigations Detective. By the time of trial, she had been promoted to Captain of the Criminal Investigations Division. We will refer to her by her title at trial.

Katherine Jennell testified that she served as the keeper of the official records related to the Sullivan County Chancery Court. She identified the court record for Mrs. Strouth and the victim's divorce case. As part of the record she identified, and the trial court admitted, a May 26, 2017 petition to modify the parenting plan filed by Mrs. Strouth and a notice of hearing for the petition to modify scheduled for July 7, 2017. The record also contained a subsequent notice of hearing filed in July, rescheduling the hearing to September 5, 2017. Finally, Ms. Jennell identified a final mediator's report from May 2017. The mediator's report indicated that the victim appeared for the scheduled May 16, 2017 mediation; however, Mrs. Strouth did not, despite having received two notices of the hearing date. The case was dismissed in October 2017, due to the victim's death.

Becky Bradshaw, the victim's sister, testified that she and the victim shared a close relationship. She described the victim as "an awesome dad" and an involved, loving uncle to her sons. Ms. Bradshaw described the victim's co-parenting relationship with Mrs. Strouth as "[v]olatile" with "many disagreements" about custody of A.H. Due to their contentious relationship, the court had ordered custody exchange of A.H. to occur at a neutral location.

Ms. Bradshaw testified that the victim worked for Anderson's, a merchandising company. As an employee, he was assigned to set up new items at Walmart, such as cologne or magazines, and would also update computer software at the Bristol Walmart. He sometimes worked at other Walmart stores, but his primary location was the Bristol Walmart. Ms. Bradshaw said that the victim's work schedule was based on A.H.'s schedule and needs. On the days the victim was to pick up A.H. from school, he would schedule his work to end at the Bristol Walmart because it was close to A.H.'s school.

Ms. Bradshaw described the victim as a creature of habit, explaining that he always parked in the same parking space at Walmart. She described the location of that space in proximity to the store. Upon viewing the Walmart surveillance video, Ms. Bradshaw confirmed that, on the day of the shooting, the victim had parked in the same space she had described for the jury.

BPD Detective Jared Patrick responded to the Bristol Walmart shooting and obtained surveillance video of the parking lot that showed a blue Hyundai enter the parking lot and park. After a few minutes, the blue Hyundai moved to another location, parked, and then to a third and final location, all three spaces within the area near the victim's Chevy Malibu. During this time, no one exited or entered the blue Hyundai. The surveillance video showed the victim walking to his car. He initially walked to the trunk of his Chevy Malibu and then around to the driver's side door, where he fell to the ground. The blue Hyundai immediately pulled out of the parking space and quickly drove away.

4

The video recording showed a Walmart employee, who had been collecting shopping carts, run to the victim. Upon viewing the surveillance video footage, Detective Patrick noted that he found peculiar both the circuitous route the blue Hyundai took to exit the parking lot and the speed with which the car exited the Walmart parking lot.

Later, after the Defendant and Mrs. Strouth were apprehended, Detective Patrick searched their vehicle for evidence related to the shooting. Inside their blue Hyundai, Detective Patrick collected receipts, a camouflage backpack, a metal wash basin, and three pillows in butterfly pillowcases. He also found a purple shirt, Bushnell binoculars, a camouflage hat, and two small Cobra walkie-talkies. One of the receipts for Walmart reflected a purchase made on August 30, 2017, at 7:43 p.m. for sunglasses, lighter fluid, a bandana, an infinity scarf, a men's cap, ammunition, a metal wash bin, and extra-large vinyl gloves. An Eastman Credit Union bank receipt showed a withdrawal in Bristol, Tennessee, on August 30, 2017, at 5:43 p.m. A June 24, 2017, Cabela's receipt found in the vehicle showed a purchase for two types of .22 long rifle ammunition, a Lead Sled shooting rest, and .270 ammunition. A final receipt showed a gas purchase on the day of the shooting at 4:47 p.m. Detective Patrick later learned that the bullet that killed the victim was .270 ammunition. He explained to the jury that the type of weapon that uses .270 ammunition is a long rifle.

During the course of the investigation, Detective Patrick obtained surveillance video from a Sheet's gas station located in Bristol, Virginia. The video recording from August 30, 2017, two days before the shooting, showed the Defendant and Mrs. Strouth entering and exiting the Sheet's gas station market. The Defendant was driving a blue Hyundai. Detective Patrick pointed out a large white butterfly sticker on the rear of the vehicle. He confirmed that he ran the license plate displayed on the blue Hyundai in the surveillance footage, and the tag number was registered to the Defendant and Mrs. Strouth. Next, Detective Patrick identified photographs taken when he processed the blue Hyundai on the night of September 1, 2017. There was no longer a butterfly sticker displayed on the back; however, there was some remaining residue where the sticker had been removed.

BPD Captain Justin Bush responded to the Bristol Walmart parking lot shooting scene and observed the victim's Chevy Malibu with the victim's car keys still in the car door. He also noticed a bullet defect to the front post on the driver's side, above the window, and between the front and rear door. Based upon this evidence, Captain Bush surmised that the Defendant was shot from behind. Captain Eller used a trajectory rod to help determine a specific angle and direction from which the gun was fired. The shooting reconstruction indicated that the bullet came from behind the victim at a forty-two to forty-five degree angle.

5

After viewing surveillance video from the Walmart, Captain Bush looked in the area where he believed the gunfire originated. On the surveillance footage, he noticed a blue SUV that moved multiple times to different parking spots without anyone entering or exiting the vehicle. All of the places the SUV parked were in the area near the victim's Chevy Malibu and the location where the blue SUV ultimately parked was where officers believed the gunfire came from. The video showed that, after the victim fell down, the blue SUV immediately left the parking lot. The State introduced still shots from the Walmart surveillance video of a blue SUV in the parking lot between 2:43 p.m. and 3:02 p.m. on September 1, 2017.

The surveillance video showed the blue SUV parked at 2:44 p.m. Less than a minute later, the blue SUV moved to a second parking spot. At 2:46 p.m., the blue SUV moved to the final parking spot, which was still within view of the victim's car. At 3:00 p.m., the victim exited Walmart and walked toward his car, holding a plastic bag in his right hand. He walked toward the driver's side of his vehicle. The surveillance video footage shows the victim dropping to the ground outside the frame, and the blue SUV immediately backing out of its parking space at 3:01 p.m. The blue SUV did not take the nearest exit to leave but instead took a more circuitous route to the exit that connected to Volunteer Parkway.

Because officers could not reach either Mrs. Strouth or the Defendant by phone, officers went to the Defendant's known address to try to find Mrs. Strouth and notify her that A.H. had not been picked up from school. Neither the Defendant nor Mrs. Strouth was at the residence. Law enforcement continued to try to contact Mrs. Strouth by phone, but their phone calls went unanswered. Law enforcement then used cell towers to determine the location of the Strouths' cell phones. The location of the cell phones was an area in close proximity to the Strouths' residential address. At 7:39 p.m., the police department issued a BOLO (Be On the Look Out) for the blue Hyundai. Approximately half an hour later, Virginia State Police located the Defendant's vehicle in Abingdon, Virginia.

When Captain Bush arrived at the scene of the traffic stop in Abingdon, Virginia, the Defendant was seated in a Virginia State Police cruiser. Captain Bush noticed that the Defendant had a small, partial circular laceration above his right eye. He observed that the Defendant's demeanor was calm. The Defendant did not ask why Captain Bush wanted to speak with him. Detective Bush also observed the Strouths' blue Hyundai parked in front of the Virginia State Police cruiser. It appeared to Detective Bush to be the same vehicle he had seen in the Walmart surveillance video.

Captain Bush testified that Mrs. Strouth was seated in a separate patrol vehicle. He described Mrs. Strouth's demeanor as "calm, no emotion." Law enforcement transported

6

the Defendant and Mrs. Strouth to the Bristol Police Department, where Captain Bush spoke with Mrs. Strouth while Detective Eric Sargent spoke with the Defendant.

During the course of the investigation, Captain Bush obtained information that indicated that the Defendant had made a purchase on September 1, 2017, the day of the shooting, at 10:33 a.m., at the Dollar General store on Lee Highway. Captain Bush obtained surveillance video from the Dollar General for the relevant time period. Captain Bush identified Mrs. Strouth and the Defendant in the video . He also identified a receipt for their purchases, which included rubbing alcohol, paper towels, and two drinks. In the surveillance video , Mrs. Strouth wore a purple T-shirt and a camouflage hat, and the Defendant wore a green shirt and sweatpants. Captain Bush noted that the Defendant and Mrs. Strouth were not wearing the same clothing they had worn at the Dollar General store by the time of the Virginia traffic stop.

On September 25, 2017, police executed a search warrant for the Defendant and Mrs. Strouth's home. In a "yard barn" on the property, officers found a Caldwell Lead sled plus box, an empty Simmons scope package, mounting rails for the scope, an ammunition box with a scope inside, and a screwdriver. He explained that a screwdriver is needed to attach and detach a scope from a rifle. Inside the residence, the officers found a .22 rifle with a scope on the gun. Captain Bush confirmed that the weapon used in the shooting was never recovered.

As part of the investigation focused on the blue Hyundai, Captain Bush obtained September 1, 2017 video surveillance  from Sam's Gun and Pawn on Volunteer Parkway. The video showed a blue Hyundai matching the Defendant's Hyundai traveling northbound on Volunteer Parkway, toward the Bristol Walmart, at 2:42 p.m. Captain Bush stated that the blue Hyundai in this surveillance recording appeared to be the same vehicle that was in the surveillance footage from the Walmart parking lot. The Walmart surveillance footage showed the blue Hyundai entering the Walmart parking lot at 2:43 p.m. The Sam's Gun and Pawn shop video footage also showed a blue Hyundai traveling southbound on Volunteer Parkway at around 3:00 p.m. Officer Cousins, who had responded to the report of the shooting at 3:01 p.m., had a dashcam in his vehicle that recorded a blue Hyundai traveling southbound away from the Walmart at 3:03 p.m. as he drove northbound toward the Walmart. Other surveillance footage showed a blue Hyundai traveling south on Volunteer Parkway, away from the Bristol Walmart at 3:09 p.m. The combined footage showed the blue Hyundai traveling north on Volunteer Parkway to Walmart Century Boulevard and then, after the shooting, southbound away from the Bristol Walmart toward Johnson City.

On cross-examination, Captain Bush read Mrs. Strouth's statement to the police :

7

I, Ashley Grace Strouth, live [on] VI Ranch Road in Bristol, Tennessee. I am married to Michael Strouth and have been for 4 years. I have a 13 year old son named [A.H.]. I had [A.H.] with [the victim]. [The victim] and I were married less than a year and were divorced in 2005. [The victim] lives at [ ] an apartment located in Bristol, Tennessee. [The victim] was mentally and physically abusive to me during the time we were together. [The victim] smoked meth. I smoked meth one time with [the victim] after I had [A.H.]. I was addicted to pain medication and only take suboxone. I am prescribed 1 1/2 to 2 pills per day. Today I have only took [sic] 1/2 of a pill around 2:00p.m. [The victim] has also cheated on me. When I filed for divorce I lived with my mom and dad. [The victim] was acting crazy during this time. [The victim] has told me he is bi-polar, but I don't know that for sure. [The victim] has accused me of sexually, physically, and emotionally abusing [A.H.] when we were separated. I only had supervised visitation and every other weekend visiting with [A.H.]. During this time, [the victim] dropped the charges and filed for divorce with a parenting plan before I could so he got [A.H.] more. [A.H.] was around 7 months old when [the victim] and I split. [The victim] didn't work and would stay in shelters with [A.H.] to keep from paying child support.

After [the victim] and I divorced. [The victim] moved to Gray, Tennessee. I would drive [A.H.] to the McDonalds in Gray for the custody exchange. The police were called several times to standby during the custody exchange. Our custody arrangement is during the months of June, July, and August, we alternate every other week. During the rest of the months, [the victim] gets [A.H.] the 1st, 3rd, and 4th weekend of the month. I get [A.H.] on the 2nd weekend.

[The victim] wouldn't let me have [A.H.] on an in-service day on August 17th, 2017. On this day, I went to [the victim]'s apartment on Belmont Drive at 6:00p.m. I waited 30 minutes and around 6:30p.m., [the victim] called the police. On August 31, 2017, [A.H.] was with [the victim] because it was his summer week. I believe I was supposed to get [A.H.] so I text [the victim] to arrange the pick-up. [The victim] told me it was his week and since the first of the month fell on his week and it was the first weekend he would be getting [A.H.] at 6:00 p.m. anyways. [A.H.] is in the 8th grade at Holston Valley Middle School and was in school on September 1, 2017. I put the custody paperwork in my 2005 Hyundai Tucson that is blue in color. The Hyundai is registered to [the Defendant] and I [sic]. [The Defendant] and [A.H.] like to play video games, play basketball, and [A.H.] has a mini bike. [The Defendant] likes to take [A.H.] to shoot guns. I don't typically like to

8

go, but will go when I'm off. [A.H.] and [the Defendant] generally have to beg for me to go with them. I have a .22 rifle that is camo. [The Defendant] and I also have a .22 pistol, another .22 rifle, a 20 gauge shotgun, a muzzleloader, and bb guns. The last time I shot a gun was a month or two ago. We typically go shooting out at Jacob's Creek. It is $2 to shoot and we just put it in an envelope there. I don't know when the last time [the Defendant] went shooting. [The Defendant] did shoot a skunk two nights ago at our house on VI Ranch Road. On August 30, 2017 [the Defendant] and I went to Wal-Mart in Bristol, Virginia. I purchased around $100 worth of stuff including some pedialite, pedialite popsicles, and ammo. I don't know what kind of ammo we bought because [the Defendant] picked it out.

[The Defendant] and I work at Universal Fibers in Bristol, TN. I work 7:00 a.m. to 7:00 p.m. My work week is 48 hours one week and 36 hours the next week, but I have been typically working 60 hours one week and 48 hours the next. I am a machinist and [the Defendant] is a material handler. As part of our job, [the Defendant] and I have to wear steele [sic] toe boots, safety glasses, I have to have my hair up, and we must wear ear plugs. Universal Fibers has 3 different kinds of ear plugs. I wear the orange tip ones on a blue chord. We get a new pair of ear plugs every time we go into work. I will either throw my ear plugs in the trash can at work or throw them in the Hyundai after my shift. I was supposed to work on September 1, 2017, but didn't go into work. I decided to stay home and look for other contempt of court paperwork to file a contempt on [the victim]. Filing a contempt of court though doesn't do much good because nothing has happened when I have filed them in the past. They end up getting dismissed.

On the morning of September 1, 2017, [the Defendant] and I went to Pal's on Volunteer Parkway around 7:00a.m.-7:30a.m. When we left the house, we spoke to my niece who works at BoJangles on Volunteer Parkway. [The Defendant] and I then drove back to our house on VI Ranch Road. I called about a late notice we had received about a storage building we had purchased. I believe the company is something like JTTH. I received an e-mail saying the payments were late. I then tried to find the contempt papers, but didn't have any luck. Around 1:00-2:00 p.m., [the Defendant] said we needed to leave the house because I was stressed. [The Defendant] and I left in our 2005 blue Hyundai Tucson. [The Defendant] and I took a left out of our driveway and went out towards Exit 17 off of 1-81. We drove to Damascus. I was driving and must not have been paying attention because we ended up in Chilhowie, Virginia. We got $31 in gas using my Eastman Credit Union debit card from an Exxon gas station in Chilhowie. We stopped

at another gas station so [the Defendant] could pee. We might have went into North Carolina at some point also because I saw several cars with North Carolina license plates parked in drive-ways. We also went to a mountain called Quiet head or White head to drive around. We pulled off on a pull off because [the Defendant] had to pee. [The Defendant] walked down a path into the woods and screamed for me. I went into the woods and found [the Defendant] holding his head. There was blood on [the Defendant]'s head. [The Defendant] said his hat came off and he slipped trying to catch it. [The Defendant] wasn't sure if he hit it on a rock or what. I have a backpack I carry in my car that has first aide supplies in it including bandages, rubbing alcohol, and liquid bandage. I got a towel and we held pressure on [the Defendant]'s head where he was bleeding. The towel was pink with orange or yellow on it. I cleaned up [the Defendant]'s wound and put liquid bandage on it. We were on the way home and threw the bloody towel in a trash can of a car wash somewhere. I'm not sure where this car wash is located exactly. We then headed home and were stopped by the police.

We agreed to come to come to [sic] the Bristol Tennessee Police Department from Virginia. I spoke with Detective Bush. Detective Bush told me [the victim] was shot and killed in the Wal-Mart parking lot off of Volunteer parkway in Bristol, Tennessee. I was told there was a blue Hyundai like mine seen in the video footage. [The Defendant] and I were never in the parking lot of Wal-Mart in Bristol, Tennessee on September 1, 2017. The Hyundai in the video is not mine or [the Defendant]'s. I was told there were ear plugs found on the ground of the area where the blue Hyundai was parked. These ear plugs aren't ours and will not have our DNA on it. [The Defendant] and I didn't have anything to do with [the victim]'s death and did not cause it. The last time I had any contact with [the victim] was through text yesterday around 4:00 p.m. to 4:30 p.m. I don't know where [the victim] works and just know he stocks cards or something at different places. I did not see any of my family on September 1, 2017 and do not have any friends.

Mrs. Strouth signed and dated the statement acknowledging that it was true and accurate. About Mrs. Strouth's demeanor, Detective Bush recalled that when he interviewed Mrs. Strouth, she never expressed any concern about why she was being detained nor did she act surprised that she was transported to the police department for an interview. He stated that Mrs. Strouth did not express concern for her son, A.H., or cry at any time.

10

Special Agent[4] Eric Sargent, a BPD detective in 2017, reported to the traffic stop with Captain Bush. Special Agent Sargent approached the Defendant, who was in the back of a Virginia State Police cruiser, and observed a circular laceration above his right eye. As a firearms instructor, Special Agent Sargent testified that he was familiar with the term "scope bite." He had observed such injuries on other people and had sustained one himself. He explained that this injury occurs when firing a high-caliber rifle with a scope mounted to the receiver end of the rifle. If the rifle is not secured against the chest to protect the shooter from recoil, the scope may hit the shooter's eye area due to the recoil when firing the rifle. Special Agent Sargent identified photographs of the Defendant with the laceration above his eye, consistent with a "scope bite."

Special Agent Sargent testified that when he arrived at the traffic stop in Virginia, the Defendant's demeanor was "calm." The Defendant never asked why he had been detained or if A.H. was safe. Special Agent Sargent recalled that the Defendant was "overly cooperative," never questioning why he was being transported to the Criminal Investigations Division office. When they arrived at the office, Special Agent Sargent escorted the Defendant to an interview room. The Defendant was still "[v]ery calm" and agreed to talk with him. Special Agent Sargent administered the *Miranda* rights to the Defendant, and the Defendant willingly gave a statement. Special Agent Sargent read the Defendant's statement aloud as follows:

> [Mrs. Strouth] and I have been married since January the 7th 2013. We got married at the Bristol Tennessee Courthouse. [Mrs. Strouth] and her husband [the victim] have been divorced since 2005 and they have a thirteen year old child A[.H.]. I think of A[.H.] as my child even though he is not biologically mine. [Mrs. Strouth] and [the victim] have been having custody issues for a while. [Mrs. Strouth] has custody of A[.H.] during the weekdays of school from September till May. [Mrs. Strouth] would get A[.H.] on Sunday's at 6 p.m. and keep him until Friday at 3 p.m. Then [the victim] would get A[.H.] on the first[,] third and fourth weekend of the month. During the summer break [Mrs. Strouth] and [the victim] would get one week on and one week off with A[.H.]. On the weekend of the race - of the race in August[,] [the victim] had refused to let [Mrs. Strouth] pick up A[.H.]. [Mrs. Strouth] was going to file contempt of custody with the courts. [Mrs. Strouth] had been so stressed out over the constant custody issues with [the victim]. On Thursday, August 31st, [Mrs. Strouth] called into work and told them she was not going to be in to work the following morning because she was going

---

[4] At the time of trial, the witness had taken a new job with the Office of Inspector General for the State of Tennessee. We will refer to him by his title at that time rather than his title with the BPD at the time of the offense.

to file contempt charges against [the victim]. [Mrs. Strouth] and I both work at Universal Fibers. [Mrs. Strouth] told me that there was no form to fill out in Tennessee for contempt. She would have to write a letter to the court. [Mrs. Strouth] was going to file the contempt for September the 1st 2017 for not getting A[.H.] on August the 31st. This morning Friday September the 1st 2017 about 9 a.m. [Mrs. Strouth] dr[o]ve us to Pal's on the Volunteer Parkway where we bought breakfast to take home and eat. We had rented a building from a rent to own place in Paris Tennessee and I was two payments behind so . . . I wanted to call this morning and talk with them about the payments. When we got to the house I called the rent to own place but no one answered. [Mrs. Strouth] and I then looked all over the house for the former contempt charge so that [Mrs. Strouth] could use the wording in it for the new contempt charge. After looking everywhere we could not locate the paper. [Mrs. Strouth] had been so down so I decided to get her out of the house. We drove to Chilhowie Virginia, Damascus, Virginia to White Top Mountain. We stopped . . . at a gas station just off Interstate in Chilhowie and [Mrs. Strouth] filled up our Hyundai with gas. [Mrs. Strouth] used her Eastman credit Union card and paid for $20.00 in gas at the pumps. I don't remember what time it was when we stopped for gas. My cell phone doesn't have any minutes so I left it at the house. I can only use it on wi-fi. [Mrs. Strouth] had left her cell phone at the house when she fed her Pomeranian so we had not talked to anyone and had no knowledge of time. We drove to White Top Mountain and I'm only guessing that we were there for about two hours. While we were on the mountain somewhere, I fell and hit my head on a rock or a log which caused a cut to forehead near my eyebrow. I couldn't even take you to where I fell. After we left the mountain I drove back through Damascus[.] I stopped at the gas station right beside the car wash to use the bathroom. We left the gas station and pulled into the parking lot of Food City in Damascus and [Mrs. Strouth] applied some liquid band aid to my cut on my forehead. We left Damascus, drove in to Abingdon passed the Barter Theater. There were a lot of people there. We drove toward Route 19 where Walgreens and Rite Aide are located. I pulled in to the car wash and was going to wash the car but I realized we didn't have any money. We then drove toward the Ford dealership and took Old Jonesborough Road. We were heading home, I wanted to go to bed. I took Mock Knob Road which is the road we travel to get to work when I . . . was pulled over by Virginia State police and several other officers. [Mrs. Strouth] and I had been together the whole day. Neither [Mrs. Strouth] nor I had gone to Walmart located at 220 Century Boulevard off Volunteer Parkway in Bristol Tennessee on Friday September the 1st 2017. Neither [Ms. Strouth] nor I have called or

talked to anyone since we left the house earlier in the day. A lot of people have vehicles that look like mine but I was never at Walmart.

Following the Defendant and Mrs. Strouth's police statements, they were released, and officers continued the investigation, attempting to corroborate the details provided. The Defendant told Special Agent Sargent that he and Mrs. Strouth bought breakfast at Pal's on the morning of September 1. Law enforcement reviewed video surveillance footage from Pal's and did not see the blue Hyundai or the Defendant and Mrs. Strouth on the premises. Additionally, the bank statement did not reveal any charges from Pal's. Law enforcement officers corroborated that the Defendant was at the Chilhowie Exxon in Virginia. Special Agent Sargent obtained a receipt from Exxon for a purchase made on September 1, 2017, at 4:47 p.m. The Defendant told officers that after getting gas, they went to Food City in Damascus. Special Agent Sargent was unable to corroborate this information with the surveillance video footage from Food City.

Special Agent Sargent identified a map generated to show the possible routes and driving time from the Bristol Walmart to Chilhowie, Virginia, where he had confirmed the Defendant and Mrs. Strouth bought gas at 4:47 p.m. on the day of the shooting. One of the routes went by the Defendant's residence and took approximately one hour, at the posted speed limit, to drive from the Walmart to Chilhowie. The next route went from the Defendant's residence to Chilhowie and took approximately thirty to forty minutes. The final route, from the Bristol Walmart to the 394 intersection to Interstate 81 northbound, took approximately fifty minutes to an hour. All of these maps were developed based upon the surveillance footage showing the vehicle traveling south from the Bristol Motor Speedway.

Special Agent Sargent photographed the Defendant on the night he was interviewed. On one of the photographs, Special Agent Sargent identified a "reddish" area on the Defendant's knuckle on his middle and index fingers. Another photograph displayed a small "reddish" marking to the Defendant's index finger and the middle finger inside the knuckle area of his left hand. Other than the injury to the eye, there were no other injuries to the Defendant's body.

At some point in the investigation, Special Agent Sargent learned that a .270 caliber bullet was lodged in the victim's vehicle. The investigation had revealed that, on June 30, 2017, the Defendant had purchased .270 caliber ammunition from the Double Tap in Blountville, Tennessee, using their Eastman Credit Union account.

On October 12, 2017, Special Agent Sargent and Sargent McCready went to the Defendant's house to ask for another statement from the Defendant. The Defendant agreed to meet with the officers at the Criminal Investigations office. Special Agent Sargent

13

explained that he had wanted to review the timeline they had developed related to the facts gathered during the investigation. As they reviewed the timeline and evidence, the Defendant was quiet. It took approximately thirty minutes to review the documentation with the Defendant. The last photographs were of the Defendant's blue Hyundai. One of the photographs was taken at the Sheet's on August 30, 2017, showing the Defendant's blue Hyundai with the butterfly decal on the back. The other photograph was taken of the Defendant's vehicle in the police garage on September 1, 2017, with the butterfly decal removed. At this point, the Defendant "shut down" and "refused to speak," thus ending the interview.

Eric Hite, custodian of records for all of the Eastman Credit Unions, testified that the Defendant and Mr. Strouth opened an account on December 30, 2016. Mr. Hite confirmed that the account was accessed on June 30, 2017, for a point of sale withdrawal from OMO Double Tap in Blountville, Tennessee. On September 1, 2017, the day of the shooting, several purchases were made through the account. A withdrawal of $18.07 from Sonic Drive-In in Bristol, Tennessee, a withdrawal of $20.00 from Sheets in Bristol, Virginia, and a withdrawal from Dollar General in Bristol, Virginia for $7.30.

Jeff Hall, a general manager for Bass Pro Shops, confirmed that his store sold ammunition. Mr. Hall identified an electronic journal of a June 24, 2017 purchase from a Cabela's store for ammunition for a .22 long rifle, .270 Winchester 20 gauge, and a Lead Sled. Mr. Hall explained that a lead sled is used to stabilize a firearm so you can "sight it in and shoot after." He said that such a device lends "accuracy" to shooting. Mr. Hall identified a photograph of an ammunition box of Hornady .270 Winchester as the type sold at Cabela's. He was also able to match the sale in the electronic journal to the receipt found in the Defendant's vehicle for the purchase of .270 Winchester ammunition, the brand Hornady Interlock.

Patrick Hyde, the Defendant's former brother-in-law, testified that during the investigation of the shooting, he spoke with the Defendant about the homicide investigation. The Defendant told Mr. Hyde that he "wished he could take it back." He also told Mr. Hyde that if the State offered him a fifteen-year sentence, he "would take it." The Defendant talked with Mr. Hyde about Mrs. Strouth's role, saying, "she wouldn't leave him alone about it." Mr. Hyde confirmed that the Defendant's statement related to Mrs. Strouth "having [the Defendant] have to murder the victim." Mr. Hyde confirmed that he made an anonymous phone call to the police department on November 20, 2017, about these conversations with the Defendant.

Eddie Fink, Sr., was in prison serving a sentence for burglary other than a habitation and, for a period of time, shared a cell with the Defendant. The Defendant stated that he

14

had fired a shot through a car and that it had left a hole in the car door. He also admitted to having shot a person, and, as a result, his life was over.

Rex Carter, a security operations specialist and human resources generalist at Universal Fibers, testified that the Defendant and Mrs. Strouth were employed at Universal Fibers at the time of the shooting. On September 5, 2017, Mr. Carter was present during a meeting with the Defendant, Mrs. Strouth, and the Human Resources Director. The purpose of the meeting was to discuss their work schedule during the investigation of the shooting. During the meeting, both the Defendant and Mrs. Strouth were "very nervous." Mr. Carter recalled that the Defendant kept touching his face and "hiding his face behind his hands" and that Mrs. Strouth was wringing her hands. Mr. Carter observed a cut above the Defendant's right eyebrow. Based upon his experience with guns, Mr. Carter said that the injury appeared to be a "scope bite." When asked about the injury, the Defendant stated that the wind had blown his hat off and that, when he went to retrieve it, he slipped on either a rock or a log.

Samuel Wheeler worked with the Defendant at Universal Fibers. Mr. Wheeler recalled that there would regularly be "down time" at work. During these times, the employees would talk. The Defendant was part of these conversations and expressed that he and Mrs. Strouth were having "issues with their son's biological father," the victim. According to Mr. Wheeler, the Defendant spoke about A.H. as if A.H. were the Defendant's own son.

Approximately a month before the shooting, the Defendant told Mr. Wheeler that he had bought a .270 rifle from his cousin in North Carolina. About a week before the shooting, the Defendant told Mr. Wheeler that he had to sell the .270 rifle "back to his cousin." The day after the shooting, the Defendant and Mrs. Strouth came into work. Mr. Wheeler noticed the Defendant had an injury to his forehead that appeared as if the Defendant "had been scoped." He explained that this occurred when a shooter had their face too close to a scope. He had sustained this type of injury and recognized it on the Defendant's face. Mr. Wheeler stated that he was told the injuries came from a hiking accident, yet the Defendant had no other marks or injuries other than around his eye.

Jeremy Stitt, a Universal Fibers employee, characterized his relationship with the Defendant as friends and confirmed that they spoke during breaks at work. Mr. Stitt described the Defendant as "very protective over" A.H. and Mrs. Strouth. The Defendant spoke with Mr. Stitt about the custody issues between Mrs. Strouth and the victim. The Defendant disclosed that he was not allowed to be present during the custody hearing and he was upset because he believed Mrs. Strouth was not being treated fairly. The Defendant believed that the victim had an unfair advantage in court. The Defendant did not like the victim and was afraid that Mrs. Strouth would lose custody of A.H. At some point, the

15

Defendant, due to his fear of losing custody of A.H., told Mr. Stitt that he wanted to kill the victim.

Mr. Stitt testified that the Defendant waited in the car or in the parking lot during the custody hearings, and the Defendant had expressed his desire, after the hearings, to beat up the victim as he exited the courthouse. Mrs. Strouth, however, would not allow him to do so because she did not want any "drama." Mr. Stitt said that Mrs. Strouth and the Defendant were very close and that the Defendant was very jealous with respect to Mrs. Strouth's attention. The Defendant told Mr. Stitt that he "wanted to be [A.H.]'s dad without [the victim]." Mr. Stitt recalled that the Defendant told him that he planned to buy a .270 rifle from his cousin. Based upon this information about the Defendant acquiring a .270 rifle, Mr. Stitt offered to go hunting with the Defendant, but the Defendant never took Mr. Stitt up on the offer. Later, the Defendant told Mr. Stitt that he sold the .270 rifle back to his cousin because he "was afraid what he was going to do with it." The Defendant also told Mr. Stitt that he had purchased a gun sled. Mr. Stitt thought this odd because none of the guns the Defendant owned necessitated a gun sled.

On September 13, 2017, Mr. Stitt was parked at Pal's "on the Parkway," and the Defendant approached him and knocked on his car window. Mr. Stitt noticed that the white butterfly sticker that had been on the back of the blue Hyundai was gone. He asked the Defendant about the sticker, and the Defendant told him that the sticker had "bubbled up," so he removed it. Mr. Stitt also noticed an injury to the Defendant's forehead, and he asked about it. The Defendant told him that he fell and hit a rock. Mr. Stitt was suspicious of this explanation, believing the explanation was inconsistent with the injury.

Darryl Valinchus, the owner of Telefore, LLC, testified as an expert witness in the field of communications analysis. Mr. Valinchus explained that his company provided expert communications analysis of communications records and geospatial visualization of cellular telephones. Mr. Valinchus was provided with information related to this case and analyzed the data provided. Mr. Valinchus ran a search for the information extracted from the Defendant's cell phone for certain words associated with this case such as guns, rifles, lead sled, and scopes. The result was 272 events on the cell phone that matched the words he searched for. The searches for identified terms such as "rifle" began on June 15, 2017. The last date was September 1, 2017.

Mr. Valinchus also reviewed four cached images from the phone. Two of these cached images had visual references from Google android maps. On June 17, 2017, the date the images were collected, the cell phone was located in the vicinity of the Defendant's residence. There were two hundred and eighty images in one cache related to geographical areas. Sixty-five were for the Defendant's residence at VI Ranch Road, fifty-nine were for Century Boulevard where the Bristol Walmart is located, and three for Belmont Drive, the

16

victim's residence. Based on the extracted information, it appeared that the Defendant was reviewing satellite imagery (aerial views) of each of these locations.

After hearing this evidence, the jury convicted the Defendant of first degree premediated murderand conspiracy to commit first degree murder, a Class A felony. The trial court imposed a life sentence for the first degree premeditated murder conviction and scheduled a sentencing hearing to determine the sentence for the conspiracy to commit first degree murder conviction.

## B. Sentencing

At the sentencing hearing, the State presented three witnesses, and the Defendant offered a statement in allocution. Becky Bradshaw, the victim's sister, testified that the victim was a loving and devoted father. She spoke of his good character and love for his family. She spoke of A.H.'s loss of a father, a mentor, and stability due to the murder. Tanna Wheelock, the victim's mother, testified about the impact of the victim's death on her and on her grandson, A.H. She asked that the trial court impose the maximum sentence. The final witness for the State, Amanda Neurether, the victim's sister, testified about the victim's positive influence on her life. She described the emptiness she felt in the wake of his death.

The Defendant offered a statement in allocution. In doing so, he denied any responsibility or role in the victim's death. He stated that he did not know who killed the victim, but if he did, he "would let you know."

The trial court stated that it had considered the evidence presented at trial and the sentencing hearing, the presentence report, the principles of sentencing, the nature and characteristics of the criminal conduct, and evidence concerning the mitigating and enhancement factors. The trial court then reviewed enhancement and mitigating factors. It found applicable five enhancement factors and one mitigating factor and sentenced the Defendant to twenty-five years for the conspiracy to commit first degree murder conviction. The trial court then considered consecutive sentencing and found the Defendant was a dangerous offender as a basis to impose consecutive sentencing, for an effective sentence of life plus twenty-five years. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; (2) the trial court improperly declined to give the enhanced identification

17

and general inferences jury instructions; (3) and the trial court's sentence was excessive. The State asks us to affirm the trial court in all respects.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions for first degree premeditated murder and conspiracy to commit first degree premeditated murder. Specifically, he argues that the State failed to prove identity and premeditation to commit murder. The State responds that the evidence is more than sufficient to sustain the convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

### 1. First Degree Premeditated Murder

In order to convict the Defendant of first degree murder, the jury had to find, beyond a reasonable doubt, that the Defendant committed a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2018).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor

19

from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, viewed in the light most favorable to the State, showed that the Defendant was angry at the victim due to custody issues over A.H. The Defendant expressed his resentment of the victim to co-workers and a family member and had stated his desire to both cause harm to and kill the victim. The Defendant wanted to be A.H.'s father, without the victim's presence, and he believed Mrs. Strouth was being taken advantage of in the custody court proceedings that he was not allowed to attend.

In the weeks leading up to the shooting, the Defendant purchased .270 ammunition, which was consistent with the ammunition found embedded in the victim's vehicle after the shooting. The Defendant told co-workers that he had purchased a hunting rifle from his cousin that fired .270 ammunition. Store receipts document that the Defendant also purchased a lead sled and a scope, items that lend accuracy to shooting. The Defendant used his cell phone to research items related to the shooting and the geographical locations of the victim's residential address and work address. On the day of the shooting, the Defendant's car was captured on surveillance video traveling toward the Bristol Walmart right before the shooting and then traveling away from the Bristol Walmart shortly after the shooting. Walmart surveillance video footage showed a car similar to the Defendant's blue Hyundai park in the area near the victim's car just before the shooting and then leave immediately after the shooting.

Several hours after the shooting, the Defendant and Mrs. Strouth were apprehended in Virginia. The Defendant had an injury around his eye consistent with "scope bite." He did not question the apprehension nor inquire into the well-being of A.H. He appeared to be "calm." Inside the blue Hyundai, officers found clothing consistent with the clothing the Defendant and Mrs. Strouth had been wearing earlier on the day of the shooting. The Defendant provided a statement to the police that included some details that the police were unable to corroborate. Video surveillance footage showed the blue Hyundai with a distinctive white butterfly decal on the back on August 30, 2017, days before the shooting. On the day of the shooting, the blue Hyundai no longer had the white butterfly sticker, and the Defendant admitted to removing it. Following the shooting, the Defendant disclosed to his brother-in-law that he wished he could "take it back," and he told his cellmate that he had shot someone and destroyed his life by doing so.

This evidence shows that the Defendant acted with premeditation by gathering items to assist in the shooting, plotting locations for the shooting, traveling to the victim's place of work, and waiting for the victim to leave work to pick up A.H. from school. Immediately following the shooting, the Defendant and Mrs. Strouth disposed of the murder weapon and fled the State. Upon his eventual detainment in Virginia, the Defendant appeared calm

20

and did not question the detainment or the officers' request for questioning at the police station. We conclude that there was sufficient evidence to demonstrate the existence of premeditation.

The Defendant also complains that no eyewitness testified to his presence at the Bristol Walmart on the afternoon of September 1, 2017. As stated earlier, a criminal offense may be established exclusively by circumstantial evidence. *Duchac*, 505 S.W.2d at 241. It is the jury who decides the weight to be given to circumstantial evidence and the inferences to be drawn from such evidence. As discussed above, although there was not a direct eyewitness to the Defendant shooting the victim, the State provided ample circumstantial and direct evidence of the Defendant's motive, preparation, and presence at the Bristol Walmart at the time of the shooting and, by its verdict, the jury agreed with the State's theory of the case that the Defendant shot and killed the victim.

Accordingly, we conclude that the State proved, beyond a reasonable doubt, that the Defendant acted with premeditation when he armed himself and drove to the victim's place of work at a time the victim would be leaving to pick up A.H. from school, and then shot the victim in the back as he was attempting to enter his vehicle. The Defendant is not entitled to relief as to this issue.

## 2. Conspiracy to Commit First Degree Murder

The offense of conspiracy is committed if two or more people, each having the culpable mental state required for the offense which is the object of the conspiracy, and each acting for the purpose of promoting or facilitating the commission of an offense, agree that one or more of them will engage in conduct which constitutes such offense. T.C.A. § 39-12-103(a) (2018). It is also required that "an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d) (2018).

The essential feature of the crime of conspiracy is the accord-the agreement to accomplish a criminal or unlawful act. *See State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998); *State v. Hodgkinson*, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989). A formal agreement is not required, nor must it be expressed; it may, and often will, be proven by circumstantial evidence. *See Pike*, 978 S.W.2d at 915; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992) ("[A] mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement"). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in every detail of execution." *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

21

The State presented evidence that the Defendant and Mrs. Strouth were upset and angered by custody issues with the victim. In support of overt acts taken in furtherance of the conspiracy to kill the victim, the State presented evidence to show the Defendant and Mrs. Strouth purchased or obtained a rifle, ammunition, and a lead sled, for the purpose of killing the victim. The Defendant conducted internet research to aid in planning the shooting, and the Defendant removed an identifying butterfly sticker from the Strouth's blue Hyundai shortly before the murder to avoid detection. The Defendant and Mrs. Strouth left their cell phones at their residence, presumably to avoid detection, and drove to the Bristol Walmart at a time the victim would be leaving the Walmart to pick up A.H from school. Following the shooting, Mrs. Strouth drove the Defendant out of state, and the couple concealed or destroyed the rifle to avoid detection. Based upon this evidence, a rational jury could find that the Defendant and Mrs. Strouth entered a mutual agreement to end their custody issues with the victim by killing him and then took multiple actions toward the accomplishment of that goal.

Accordingly, we conclude that the State presented proof, beyond a reasonable doubt, that the Defendant acted with Mrs. Strouth to kill the victim, ending Mrs. Strouth's custody struggles with the victim. The Defendant is not entitled to relief as to this issue.

## B. Jury Instructions

The Defendant argues that the trial court erred in instructing the jury. He acknowledges that he did not request any special instructions nor did he object to the court's jury instructions; however, he maintains on appeal that the trial court should have given the general inferences and enhanced identification instructions.

The defense in this case neither requested a jury instruction regarding the inferences or enhanced identification nor objected to the trial court's failure to charge the jury on these instructions. "Where a trial court gives an allegedly incomplete jury charge to which the defense does not object, we consider the issue waived and will review the omitted instruction for plain error only." *State v. Hatcher*, 310 S.W.3d 788, 815 n. 15 (Tenn. 2010) (citing *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007)).

> For an appellate court to grant relief on the basis of plain error,
> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting and adopting the test established by *State v. Adkisson*,

22

899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). A defendant must establish all five factors before this Court will grant plain error relief, and we may cease our review upon concluding that any of the five factors is not established. *Id*. at 283.

After review, we have concluded that the Defendant is not entitled to plain error relief on the basis of an incomplete jury charge in this case because consideration of the error is not necessary to do substantial justice.

## C. Sentencing

The Defendant contends that the trial court failed to make specific findings with respect to the enhancement factors and the consecutive sentencing factors. The Defendant asserts that the sentence is excessive. The State asks us to affirm the sentence.

On appeal, a defendant bears the burden of establishing that his sentence is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708.

### 1. Enhancement Factors

The Defendant asserts that the trial court misapplied enhancement factors when imposing the maximum sentence of twenty-five years for the conspiracy to commit a first degree murder conviction, a Class A felony.

23

At the sentencing hearing, the trial court found that the Defendant was a Range I standard offender based upon his criminal history. The trial court then considered enhancement factors to determine the Defendant's sentence for the Class A felony with the sentencing range of fifteen to twenty-five years. The trial court found five enhancement factors applied and ordered a sentence of twenty-five years.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2018).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2018); *see also Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a

24

manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

Here, the trial court applied enhancement factors: (2) "the defendant was a leader in the commission of an offense involving two (2) or more criminal actors;" (5) "the defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense;" (6) "the personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great"; (9) "the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense"; and (10) "the defendant had no hesitation about committing a crime when the risk to human life was high" T.C.A. § 40-35-114 (2), (5), (6), (9), (10). The trial court also determined that the Defendant's lack of a criminal history was "somewhat of a mitigating factor," but that "the enhancing factors substantially outweigh[ed] any potential mitigating factors."

At the sentencing hearing, the trial court made the following findings with respect to enhancement and mitigating factors:

> As far as enhancement factors, I think the . . . relevant factors would be two – that he was the leader in the commission of an offense involving two or more criminal actors. Five – he treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. Six, the personal injuries inflicted or amount of damage were particularly great, obviously. Um, of course, nine would be an enhancement factor, he possessed or employed a firearm during the commission of the offense. Ten is applicable, that he had no hesitation about committing a crime when the risk to human life was high. Um, those would be the [ ] enhancement factors that I'm finding here today. The mitigating factors, Mr. Dillow has filed a response and he's added the lack of prior criminal history, and I would find that that's somewhat of a mitigating factor. I find that the enhancing factors substantially outweigh any potential mitigating factors.

In this case, the trial court failed to place on the record its reasoning with respect to the application of the enhancement factors. The statute requires trial courts to, in addition to naming which factors considered, to place on the record "the reasons for the sentence, in order to ensure fair and consistent sentencing." T.C.A. § 40-35-210(e). In this case, the trial court identified five factors applied to enhance the Defendant's sentence to the maximum in the range but offered no findings as to the application of these factors. Thus, we remand for the trial court to place its findings with respect to each applicable enhancement factor on the record.

25

## 2. Consecutive Sentencing

The Defendant contends that the trial court erred by imposing consecutive sentences. Again, the Defendant asserts that the trial court failed to conduct the prescribed analysis before imposing consecutive sentences. In response, the State argues that the trial court clearly stated its reasons for ordering consecutive service of the Defendant's sentences and that it did not abuse its discretion in doing so.

In *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013), the Tennessee Supreme Court expanded its holding in *Bise* to also apply to decisions by trial courts regarding consecutive sentencing. *Id.* at 859. This Court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861. "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." *Id.* at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)).

A trial court "may order sentences to run consecutively" if it finds the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(4); *see State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences ... reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. Our supreme court has stated that the trial court must make specific findings about "particular facts" which show the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In imposing consecutive sentences on the basis that the defendant is a dangerous offender, the trial court articulated its reasons as follows:

> I find that he's a dangerous offender who's [sic] behavior indicates little or no regard for human life and there's no hesitation about committing a crime in which the risk to human life is high. And I find that the three criteria apply, the circumstances are obviously aggravated, this was a - the jury found that that [the Defendant] did murder . . . the victim. Um, I find that the circumstances are aggravated [ ], I also find that confinement for an extended period of time is necessary to protect society from the defendant[']s unwillingness to lead a productive life and resort to criminal activity [ ], in this - in this instance and I - I [ ] feel that the [ ], sitting factor, that the

aggregate length of the sentences originally relate to the offense to which the defendant stands convicted. He took [A.H.]'s father away from him with the actions and those - and I would find that that consecutive sentencing is discretionary but needed in this matter.

In determining whether to require the Defendant to serve his sentences consecutively, the trial court first determined the defendant had no hesitation about committing a crime in which the risk to human life was high. *See* T.C.A. § 40-35-115(b)(4). As a result, the trial court determined the defendant was a dangerous offender.

The trial court then proceeded to consider the *Wilkerson* factors. Although the trial court stated on the record that an extended sentence was necessary to protect the public from further criminal conduct by the Defendant and that the length of the Defendant's sentence reasonably related to his offenses, it failed to state the specific facts it found to satisfy its conclusion. *See State v. Calloway*, No. M2004-01118-CCA-R3-CD, 2005 WL 1307800, at *13 (Tenn. Crim. App. June 2, 2005) (Woodall, J.) ("We agree with Defendant's contention that the trial court failed to make the specific factual findings required by *Wilkerson* as a prerequisite to finding that Defendant is a dangerous offender for whom consecutive sentencing is appropriate. The mere recitation of the *Wilkerson* factors is not a substitute for the requirement of making specific findings."); *State v. Scott M. Craig*, No. E2001-01528-CCA-R3-CD, 2002 WL 1972892, at *9 (Tenn. Crim. App. Aug. 27, 2002), *no perm. app. filed* ("A mere statement that confinement is necessary to protect society and that the severity of the sentence is reasonably related to the convicted offenses, without more, is insufficient to justify consecutive sentences [under *Wilkerson*]."); *Wilkerson*, 905 S.W.3d at 938 (holding the trial court must make "specific findings regarding the severity of the offenses and the necessity to protect society before ordering consecutive sentencing under Tenn. Code Ann. § 40-35-115(b)(4)"). Because the trial court failed to make the required findings regarding factor (4), this factor does not support consecutive sentencing. *Pollard*, 432 S.W.3d at 869 ("[W]hen trial courts fail to include the two additional findings before classifying a defendant as a dangerous offender, they have failed to adequately provide reasons on the record to support the imposition of consecutive sentences."). Accordingly, this Court cannot defer to the trial court's exercise of discretion nor presume that the imposition of consecutive sentences was reasonable. *See State v. Carpenter*, No. W2019-01362-CCA-R3-CD, 2020 WL 7040983, at *8 (Tenn. Crim. App. Nov. 30, 2020); *State v. Robinson*, No. W2019-00216-CCA-R3-CD, 2019 WL 6876778, at *7 (Tenn. Crim. App. Dec. 16, 2019).

In *Pollard*, our supreme court explained that, when facing this situation, this Court has two options: "(1) conduct a *de novo* review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Pollard*, 432

27

S.W.3d at 864 (citing *Bise*, 380 S.W.3d at 705 & n.41). Because the consideration required under *Wilkerson* involves a fact-intensive inquiry, the better course is to remand the case to the trial court to determine the propriety of consecutive sentencing. *Id.* Accordingly, we vacate the imposition of partial consecutive sentencing and remand to the trial court for a new sentencing hearing.

## III. Conclusion

Based on the foregoing authorities and reasoning, we affirm the Defendant's convictions. We, however, vacate the Defendant's sentence for conspiracy to commit first degree murder and the imposition of consecutive sentencing and remand to the trial court for further proceedings consistent with this opinion.

_S/ *ROBERT W. WEDEMEYER*_
ROBERT W. WEDEMEYER, PRESIDING JUDGE